## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM JACKSON,<br>   **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 25-CV-1148** |
| | : | |
| **SGT. EASON,** *et al.*, | : | |
|    **Defendants.** | : | |

### MEMORANDUM

**BAYLSON, J.**                                                    **MAY 26, 2026**

Plaintiff William Jackson filed this *pro se* civil rights action against Defendants Sergeant

Eason, Corrections Officer Carl Robertson, Corrections Officer Rouse, Sergeant Pucci,

Corrections Officer Hailey, Lieutenant Jane Doe, Nurse Jane Doe 1, Nurse Jane Doe 2,

Lieutenant Gordon, Corrections Officer Rodriguez, Corrections Officer Taylor, Sergeant

Bangert, Lieutenant Stephens, Unit Manager Fedder, Sergeant Terra, Corrections Officer Kalb,

Corrections Officer Hopson, Lieutenant Aguilar, Major Mascellino, Superintendent Joseph

Terra, Deputy Hensley, Deputy Superintendent Kertes, Corrections Classification and Program

Manager John Muick, Registered Nurse Rosemarie Joseph, Lieutenant John Doe, Psychological

Services Specialist Jane Doe, and COs John Doe's 1-14.[1]  Defendants are employed by SCI

Phoenix and sued in both their individual and official capacities.  Jackson alleges during his

---

[1] In his Complaint, Jackson identifies Defendants Pucci as "Poochi," Hailey as "Haley,"
Corrections Officer Rodriguez as "Sergeant Rodriguez," Corrections Officer Taylor as
"Lieutenant Taylor," Stephens as "Stephenson," Superintendent Joseph Terra as "Facility
Manager Joseph Terra," Deputy Superintendent Kertes as "Deputy Curtis," Registered Nurse
Rosemarie Joseph as "Nurse Rosemary," and Corrections Officer Carl Robertson as "Corrections
Officer Rob."  In their Motion to Dismiss, these defendants clarified the correct spellings of their
respective names and/or positions at SCI Phoenix, which the Court will refer to them.  (*See* ECF
No. 24 at 2.)  The Court will direct the Clerk of Court to update the docket to accurately reflect
their names and/or titles.  The Court will also refer to the title of "Correctional Officer" as "CO."

incarceration at SCI Phoenix, Defendants denied his access to the courts and retaliated against him in violation of the First Amendment and were deliberately indifferent to his serious medical needs and failed to protect him in violation of the Eighth Amendment. Defendants collectively[2] filed a Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 24), and Jackson has filed a response. (ECF No. 33.) For the following reasons, Defendants' Motion will be granted in part and denied in part.

## I.    FACTUAL ALLEGATIONS[3]

Jackson, an inmate currently incarcerated at SCI Chester, was an inmate at SCI Phoenix at all times relevant to his claims. (Compl. at ¶ 1; *see also* ECF No. 32.) He alleges a series of

---

[2] The following Defendants filed the Motion: Sergeant Eason, CO Robertson, CO Rouse, Sergeant Pucci, CO Hailey, Lieutenant Gordon, CO Rodriguez, CO Taylor, Sergeant Bangert, Lieutenant Stephens, Unit Manager Fedder, Sergeant Terra, CO Kalb, CO Hopson, Lieutenant Aguilar, Major Mascellino, Superintendent Terra, Deputy Hensley, Deputy Kertes, Corrections Classification and Program Manager Muick, and Registered Nurse Joseph. When referencing an individual Defendant, the Court will refer to him/her by last name. The Court recognizes Jackson also named several "Doe" defendants, and it is his obligation to identify the Doe Defendants during discovery, so they can be served. If he can successfully identify these Defendants, he shall file a motion to substitute their names.

[3] The factual allegations set forth in this Memorandum are derived from Jackson's Complaint ("Compl."), which consists of approximately fifty-three typewritten pages, six attached exhibits, a table of contents, and a cover page. (ECF No. 1.) The six attached exhibits are also filed as a separate exhibit and appear to be duplicative of the exhibits attached to the Complaint. (*See* ECF No. 1 at 54-60 & ECF No. 1-2.) Where the Court quotes from the Complaint, punctuation, spelling, and capitalization errors will be cleaned up. The Court adopts the sequential pagination assigned by the CM/ECF docketing system; citations will be to a document's page number unless a pilcrow sign (¶) is present, which refers to a specific paragraph number. The Court may consider matters of public record when conducting a screening under § 1915. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). The Court may also take judicial notice of prior court proceedings. *See Orabi v. Att'y Gen.*, 738 F.3d 535, 537 n.1 (3d Cir. 2014) ("We may take judicial notice of the contents of another Court's docket.") (collecting cases); *see also In re Ellerbe*, No. 21-3003, 2022 WL 444261, at *1 (3d Cir. Feb. 14, 2022) (*per curiam*) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988) (holding that court may take judicial notice of the record from previous court proceedings)).

events that took place over the course of several years, which the Court will summarize in chronological order.

**Count 15**

Jackson alleges on September 20, 2022, Defendants COs Hopson and Lieutenant Aguilar confiscated his Nike Sneakers and washtub during a property inventory because he did not purchase the items at SCI Phoenix.  (Compl. at ¶¶ 129-130.)  He claims Hopson and Aguilar also confiscated his legal property related to an open case, *Jackson v. Demaske*, which was in the discovery stage at that time.[4]  (*Id.* at ¶ 133.)  Jackson filed a grievance related to the seizure of his personal property, which he claims Defendant Major Mascellino "erroneously denied" because the items were purchased at previous institutions and they were grand-fathered property per DOC policy.  (*Id.* at ¶¶ 130-132.)  He filed a separate grievance related to the confiscation of his legal property and asserts he received an Initial Review Response from Mascellino denying his grievance on October 14, 2022, "stating that if Jackson is unable to present a legal exemption by October 17, 2022, his property would be shipped or destroyed in reference to [his] case."  (*Id.* at ¶¶ 135-136.)  He attached the Initial Review Response to his Complaint, identified as Grievance #999231.  (*Id.* at 56.)  He further alleges he had previously sent a legal exemption request to Defendant Superintendent Joseph Terra, which was partially approved and sent to Hopson and Defendant Deputy Hensley in the property room on November 8, 2022.  (*Id.* at ¶¶ 134, 146-147.)  He asserts Hopson failed to respond to his request to release his legal materials and insinuates that his legal materials were destroyed because he did not receive the exemption by the October 17, 2022 deadline.  (*Id.* at ¶¶ 138, 147-148.)  He claims he was unable to conduct

---

[4] Jackson appended to his Complaint what appears to be an ECF docket entry reflecting a Second Amended Case Management Order and two pages of a Court Order from *Jackson v. Demaske*, No. 20-1226 (W.D. Pa.).  (*See* Compl. at 57-59.)

3

discovery and missed a deadline in his pending lawsuit and his conspiracy claims were ultimately unsuccessful in that case based on not having access to his legal materials.  (*Id*. at ¶¶ 305-315.)  Based on these events, he brings access to courts claims against Hopson, Hensley, Aguilar, and Mascellino (Count 15).  (*Id*.)

**Counts 1, 2, and 3**

Jackson "suffers from chronic ailments," including asthma, heart disease, and high blood pressure, and alleges he was "repeatedly been denied medical treatment" throughout his incarceration at SCI Phoenix.  (*Id*. at ¶¶ 44-45.)  He is prescribed two daily inhalers for his asthma and two daily medications for his high blood pressure, but is not prescribed medication for his "uncurable heart disease."  (*Id*. at ¶¶ 46-48.)  He alleges on the evening of December 12, 2022, around the same time medications were being distributed by non-party Nurse Varissa, he was "having chest pains and was having a hard time breathing, while locked in and secured inside his cell."  (*Id*. at ¶¶ 49-50.)  He told an inmate outside the locked cells about his issues, and the inmate alerted Varissa, who came to his cell shortly after.  (*Id*. at ¶¶ 51-52.)  Jackson told Varissa that "he ran out of his inhalers and was having extreme chest pains," and she confirmed she would get him "sent to the medical triage to get checked out."  (*Id*. at ¶ 53.)  Jackson alleges shortly after, he explained his medical issues to Defendants Sergeant Eason, CO Carl Robertson and CO Rouse, but after nothing happened for fifteen minutes, he pushed his emergency button in his cell.  (*Id*. at ¶¶ 54-55.)  He claims Robertson said help was on the way, but nothing happened for an additional fifteen minutes, so he hit his emergency button again and "was told the same thing."  (*Id*. at ¶¶ 55-56.)  Jackson then asked an inmate for help and to ask for an update from the "control bubble."  (*Id*. at ¶ 57.)  When the inmate returned, he told Jackson that Eason said, "let inmate Jackson die and to mind his own business."  (*Id*. at ¶ 58.)  Jackson hit his

emergency cell button again and asked for help.  (*Id*.)  Shortly thereafter, non-party CO Purnell came to his cell, and he told her about his breathing issues and that he "was scared that he would die."  (*Id*. at ¶ 59.)  Purnell "quickly got on her walkie talkie and told the officers in the bubble" about Jackson's issues, which they responded, "not to worry about Jackson."  (*Id*. at ¶ 60.) Jackson claims Varissa and Purnell both checked on him again and confirmed they tried to get him help, but Eason, Robertson, and Rouse "didn't care."  (*Id*. at ¶¶ 61-62.)  Jackson hit his emergency button again, and Robertson told him that "his cell door was broke and couldn't open."  (*Id*. at ¶ 63.)  Nearly three hours later, when there was a shift change, the new shift officer immediately came to Jackson's cell and took him to the medical triage to get help.  (*Id*. at ¶¶ 64-65.)  Jackson filed a grievance after this incident.  (*Id*. at ¶ 66.)

Based on these events, he brings claims against Eason, Robertson, and Rouse for deliberate medical indifference (Count 1) and failure to protect (Count 2) in violation of the Eighth Amendment as well as state law tort claims (Count 3).  (*Id.* at ¶¶ 178-205.)

**Counts 4, 5, 6, 7, and 8**

On February 3, 2024, Jackson alleges "at/or around 2:15 p.m., [he] hit his emergency in cell call button and requested to speak to the Lieutenant, due to having chest pains" and Defendant Sergeant Pucci subsequently came to his cell.  (*Id*. at ¶¶ 67-68.)  After explaining his symptoms and telling Pucci he felt like "he was about to die," Pucci told him that because the block was locked down, he could not go to medical.  (*Id*. at ¶¶ 69-70.)  Jackson asserts he begged for helped, but Pucci "dismissively answered, 'Just lay down and die'" as she walked away.  (*Id.* at ¶ 70.)  Later that day around 4:00 p.m., while "suffering and holding his chest," he asked Defendant CO Hailey for "some help due to his extreme chest pains," and Hailey said he would notify Pucci.  (*Id*. at ¶¶ 72-73.)  After fifteen minutes, he hit his call button and "told the bubble

officer, CO John Doe that he was having severe chest pain, and Sgt. Pucci responded that she doesn't believe that [he was] having chest pains and he's not getting out of his cell and medical was coming to the block and [he] would be charged for playing games." (*Id.* at ¶ 73.) Shortly after, two Jane Doe Nurses, presumably Defendants Nurse Jane Doe 1 and Nurse Jane Doe 2, arrived with a wheelchair, and Defendant "Lt. Jane Doe along with Sgt. Pucci came to [his] cell and told him if he goes to medical for having chest pains, then he's going to the RHU ('Restricted Housing Unit') as well." (*Id.* at ¶ 74.) Jackson did not understand what Pucci meant until he was going to the medical unit and Defendant "CO John Doe (Security Officer)" told Jackson that "he didn't care about [his] chest pains, he better turn around and cuff up." (*Id.* at ¶¶ 75-76.) Jackson complied and Security Officer Doe placed the handcuffs on his wrists "extra tight, essentially cutting off [his] blood flow and circulation while medical stood by and said nothing." (*Id.* at ¶ 77.) He then explained to Defendant Lieutenant Gordon "what the problem was in reference to his chest pains and asked if he could loosen the handcuffs because they were extremely tight, however, Lt. Gordon said no" and that he was going to "the hole." (*Id.* at ¶ 78.) Before he was escorted back to the medical unit, Jane Doe Nurses 1 and 2 "told Lt. Jane Doe to make [him] walk the long way to medical while they took the shorter route" and halfway through the walk, Lieutenant Jane Doe remove his handcuffs. (*Id.* at ¶¶ 80-82.) Once he arrived at the medical unit, "he was hooked up to an EKG machine, and his vitals were taken, however, once his vitals were revealed, the nurses began to panic and admitted that [his] blood pressure was so high, he was on the verge of having a stroke and/or either a heart attack." (*Id.* at ¶ 83.) The nurses gave him several pills and told him that "he had to wait inside of the waiting room for at least an hour, until his blood pressure subsided." (*Id.* at ¶ 84.) Jackson was handcuffed about twenty minutes later, and Gordon explained that "as they (Defendants) were searching [his] cell,

they discovered that Jackson had a lawsuit against SCI-Greene, and once he saw the pictures inside of Jackson's discovery pertaining to said lawsuit, he knew how to make these charges stick." (*Id*. ¶ 85.) Jackson was told later that evening that he was being sent to the RHU for drugs and Gordon was "going to make sure that Jackson gets charged." (*Id*. at ¶ 87.) He alleges these Pucci, Haley, Gordon, Lieutenant Jane Doe, Jane Doe Nurses 1 and 2, and Security John Doe Officers 1-4, "had their minds made up that Jackson was going to the RHU simply because he complained of having chest plains albeit, they all ignored and were indifferent to his obvious medical concerns." (*Id*. at ¶ 88.) He claims he "suffered for at least three hours before he was taken to medical" and filed a grievance related to this matter. (*Id*. at ¶ 89.)

Based on these events, he brings claims against Pucci, Haley, Gordon, CO John Doe, Lt. Jane Doe, and Security CO John Doe for deliberate medical indifference (Counts 4 and 7) and against Jane Doe Nurses 1 and 2 for failure to protect in violation of the Eighth Amendment (Count 6), as well as claims under state tort law (Count 5). (*Id.* at ¶¶ 206-243.) He also brings First Amendment retaliation claims against Gordon and Security CO John Does 1-4 (Count 8). (*Id.* at ¶¶ 244-251.)

**Count 16, 17, 18, and 19**

Jackson generally alleges that the "hazardous" and "toxic" air quality in the RHU caused him to constantly cough and choke "from the polluted environment," which heightened "the risk of Jackson having an asthma attack from shortness of breath, or possibly even dying." (*Id*. at ¶¶ 153-154.) He felt like he was suffocating on a daily basis and "constantly request[ed] inhalers, but the bubble officers never answer[ed] the emergency call buttons, making it even harder to breathe." (*Id*. at ¶ 157.) For instance, he asserts that while he was sleeping on February 17, 2024, "the air was cut off" and he "woke up from a lack of oxygen [and] he immediately started

coughing." (*Id.* at ¶ 151.)  He "rushed to his call button and pushed it over a hundred (100) times," but claims Defendant John Doe Officer never responded while he was choking and coughing due to the polluted air quality.  (*Id.* at ¶ 152.)

He alleges the next day, the air was still off when Defendant Registered Nurse Rosemarie Joseph "was doing a round," and he told her that he could not breathe and "was having extreme chest pains."  (*Id.* at ¶ 159.)  Joseph explained there was nothing she could do, so he asked her why she was walking around.  (*Id.* at ¶ 160.)  She responded, "to make it look good."  (*Id.*)  Before she walked away, he asserts he "again pleaded with her to get him help."  (*Id.* at ¶ 161.)  Shortly after, CO Doe responded to his cell to inquire about what was wrong, and Jackson explained his chest pains and difficult breathing.  (*Id.*)  CO Doe said he "told the nurse, but she walked away," presumably referring to Joseph.  (*Id.*)  Jackson filed a grievance and claims the grievance officer who responded to the Initial Review Response "admits that Jackson told [Joseph] that he was having chest pains and he couldn't breathe" and the RHU Lieutenant was also implicated in this incident.  (*Id.* at ¶ 162.)

He next claims on February 19, 2024, he "repeatedly hit his call button" because he was experiencing a shortness of breath and had two inhalers "inside of the bubble" that he needed brought to his cell in order "to open his lungs."  (*Id.* at ¶¶ 163-164.)  He alleges the bubble officer, a John Doe Defendant, "refused to answer the emergency call button, although he [was] aware that Jackson has asthma, high blood pressure, and heart disease."  (*Id.* ¶ 164.)  He hit his emergency call button and requested his inhalers again due to shortness of breath on February 21, 2024, but the bubble officer, presumably CO Doe, "claim[ed] that he couldn't locate Jackson's inhalers inside of the bubble."  (*Id.* at ¶ 166, 168.)  He asserts Defendant Psychiatrist Jane Doe should also be held accountable because he told her that same day about his "hard time

8

breathing and she told Jackson that there was nothing she could do." (*Id*. at ¶ 169.)  He also generally claims Superintendent Terra, Stephens, Fedder, and "both RHU lieutenants," presumably Defendants Deputy Superintendent Kertes and Corrections Classification and Program Manager John Muick (*see id*. at ¶ 317), knew the air quality was hazardous to his health because he "submitted request slips" and filed several grievances "in reference to these atrocious acts." (*Id*. at ¶¶ 153, 158.)  He attached an Initial Review Response from the facility dated March 21, 2024, denying his grievance related to the air quality, identified as Grievance #1075493, indicating that "it should be noted that the ongoing issue of air quality in the RHU is a result of other inmates." (*Id.* at 60.)

Based on these events, he claims Superintendent Terra, Stephens, Fedder, Curtis, Muick, Joseph, Lt. John Doe, CO John Doe, and Psychiatrist Jane Doe were deliberately indifferent to his serious medical needs (Counts 16 and 18) and failed to protect him (Counts 17 and 19) in violation of the Eighth Amendment. (*Id.* at ¶¶ 316-351.)

**Counts 9, 10, and 11**

Jackson next alleges that on February 9, 2024, inmate Juan Serrano Torres assaulted him during recreation and "threw urine and feces on [him] while he was in the RHU yard." (*Id*. at ¶¶ 90-91.)  When CO John Doe, identified as a security officer, came to his cell to take pictures of him after the assault, Jackson asked if he could be separated from inmate Torres, who was housed next door to him. (*Id*. at ¶¶ 93-94.)  CO Doe allegedly said he could not be separated from Torres "and if he runs his mouth about what security did, as for him being in the RHU in the first place, they're going to see to it that Jackson continues to get assaulted, this is a warning." (*Id*. at ¶ 95.)  He was "stunned" about these threats "pertaining to his grievance activity and security falsifying documents" because he exercised his constitutional rights. (*Id*. at

9

¶ 96.)  Subsequently, he alleges Torres "harassed and antagonized" him every day after this incident until he transferred to another facility on April 11, 2024, by clogging the connecting vents between their cells with feces and banging a metal table at nighttime so he could not sleep. (*Id*. at ¶¶ 96-97.)  He asked Defendants COs Rodriguez and Taylor to move him away from Torres on February 14, 2024, and they told him it was "above them and until Jackson stops filing grievances, he was going to have to deal with it."  (*Id*. at ¶ 99.)  The next day, he made the same request to Defendants Sergeant Bangert and Lieutenant Stephens, and they said he was not moving "due to his grievance activity."  (*Id*. at ¶¶ 100-102.)  Jackson alleges when he threatened to file a grievance about the matter, Stephens told him "that if he files a grievance about them not moving him away from inmate Torres, they were going to see to it that Jackson gets assaulted with feces and urine all the time from random inmates."  (*Id*. at ¶ 102.)  "This deterred Jackson from filing a grievance on the matter," but he continued to ask other prison officials to be moved away from Torres based on "the constant harassment."  (*Id*. at ¶ 103.)  For instance, in March 2024, he asked Defendants Unit Manager Fedder and Sergeant Terra to be moved away from Torres and they both declined his request "because he likes to file grievances."  (*Id*. at ¶¶ 104-105.)  He also alleges Torres was found guilty of assaulting him, and he did not attend recreation for over thirty days as a result of Defendants not moving him, even though a new DOC policy allowed inmates in the RHU with time out of their cells.  (*Id*. at ¶¶ 106-107.)  Because these Defendants "refused to move him away from his victimizer," he alleges they failed to protect him "from future violence all in the name of retaliation."  (*Id*. at ¶ 108.)

Based on these events, he brings claims against CO John Doe, Rodriguez, Taylor, Bangert, Stephens, Fedder, and Sergeant Terra for failure to protect him in violation of the

10

Eighth Amendment (Count 9), retaliation in violation of the First Amendment (Count 10), and state law tort claims (Count 11).  (*Id.* at ¶¶ 252-278.)

**Counts 12 and 13**

Jackson alleges on February 11, 2024, he was subjected to a "lethal dose of contaminant spray" when Defendant CO Kalb sprayed an inmate close to his cell after informing Kalb and Stephens that he had asthma.[5]  (*Id.* at ¶¶ 109-114.)  He filed a grievance related to this incident (*id.* at ¶ 115), and attached the Initial Review Response from the facility grievance coordinator denying the grievance, identified as #1075490.  (*Id.* at 55.)

Based on these events, he brings medical indifference (Count 12) and failure to protect claims (Count 13) in violation of the Eighth Amendment against Kalb, Stephens, and CO John Doe Officers 1-4.  (*Id*. at ¶¶ 279-296.)

**Counts 14, 20, and 21**

Jackson asserts throughout his Complaint that several Defendants retaliated against him for filing grievances.  For instance, Jackson was escorted to the property room to "get his legal documents/material for court purposes" by Rodriguez and non-party, CO Salisbury, on February 14, 2024.  (*Id*. at ¶ 116.)  When he arrived to retrieve the documents, he alleges the property officer, identified as Hopson said, "I hope you don't think you [are going to] get that lawsuit off on me, I'm going to see to it that my man, Lt. Taylor, takes care of that for me."  (*Id*. at ¶ 117.)  Hopson, who Jackson has filed numerous grievances against in the past, made a phone call, presumably to Taylor, and told Taylor to confiscate Jackson's legal materials.  (*Id*. at ¶ 118.)  He alleges Taylor seized his legal materials when he returned to the RHU and said, "Before I let you

---

[5] Defendants acknowledge that, for purposes of pleading standards, Jackson has sufficiently pled a claim of medical indifference against Stephens and Kalb for this claim (Count 12).  (*See* ECF No. 24 at 4 n.10.)

sue Hopson, I'm going to have to go through your legal materials thoroughly." (*Id*. at ¶ 119.) He told Hopson that he must be present when going through his legal materials, but Taylor responded, "When you file lawsuits, we can do what we want!" (*Id*. at ¶ 120.) Shortly after, Defendant Psychiatrist Jane Doe came to his cell and "he expressed to her that he was in a suicidal state due to being frustrated about what Lt. Taylor was doing with his property." (*Id*. at ¶ 121.) Around 10:30 a.m., Taylor allegedly came to his cell without another CO in violation of DOC policy, threatened him, and said his legal materials were confiscated since he "likes to file lawsuits, this is how things work" and if he opens his mouth, "things will get worse." (*Id*. at ¶¶ 122-123.) He did not receive his legal documents that day, "feared for his life, and knew he had to report this before things got worse." (*Id*. at ¶ 124.) The next day, Bangert, Stephens, and CO John Doe came to his cell with a box, and Bangert told him that Fedder dictated what legal documents he would receive. (*Id*. at ¶¶ 125-126.) He told them he has legal deadlines in an open case as well as future lawsuits he is pursuing. (*Id*. at ¶ 126.) Stephens told him that he can "forget about the other lawsuits and move on" because the rest of his "legal work is getting destroyed." (*Id*. at ¶ 127.) He alleges he filed a grievance related to these events. (*Id*. at ¶ 128.)

He next claims on March 4, 2024, when he requested to sign up for the yard, Kalb verbally harassed him and refused his yard request in retaliation for filing a grievance against Kalb based on the February 11, 2024 incident. (*Id*. at ¶¶ 170-171; *see also id*. at ¶¶ 109-115.) After this incident, he filed a grievance against Kalb. (*Id*. at ¶ 172.)

Lastly, he asserts on March 12 and 14, 2024, he "was scheduled to attend the law library and was denied by Sgt. Bangert (Defendant) for exercising his constitutional rights and seeking a redress for his grievances." (*Id*. at ¶ 173.) Specifically, he claims on March 12, 2024, he asked Bangert about receiving extra time in the law library. (*Id*. at ¶ 174.) Bangert allegedly

12

responded, "You're not getting any extra time in the law library until you withdraw that PREA[6]

(¶ 172) and all those grievances you filed.  Matter fact, I'm not letting you in the law library

today, tomorrow, or Thursday for that matter, and Fedder gave me his blessing, so you can forget

about that law library and any extra time."  (*Id*. at ¶ 175.)   He was subsequently "denied the law

library on both days, and after he "filed the PREA (¶ 172) against CO Kalb, Jackson never saw

the library again."  (*Id*. at ¶ 176.)  He lists eighteen additional dates in March 2024 he was denied

access to the law library, which he "quickly filed a grievance for being denied access to the

courts in retaliation for exercising his constitutional rights."  (*Id*. at ¶ 177.)

Based on these events, he brings retaliation claims against Kalb (Count 20), Hopson,

Taylor, Stephens, Fedder, Bangert, and CO John Doe (Counts 14 and 21) in violation of the First

Amendment.  (*Id.* at ¶¶ 297-304, 353-367.)

Jackson brings his claims against Defendants in both their individual and official

capacities (*id.* at ¶ 31), and he generally asserts he "fully exhausted all remedies available to

him" relevant to the grievances he filed.  (*Id.* at ¶¶ 39-40.)  He seeks compensatory and punitive

damages for his claims.  (*Id*. at 51.)

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint."

*Peters v. Brown,* 793 F. App'x 118, 123 (3d Cir. 2019) (*per curiam*) (quoting *Kost v.*

*Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (internal quotations omitted).  In deciding a motion

to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

[6] "PREA" refers to the Prison Rape Elimination Act.

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  It is the defendant's burden to show that a complaint fails to state a claim.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (same).  To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up) (*abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024)).  The Court affords a liberal construction to factual allegations when a complaint is filed by a self-represented litigant. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021)

14

Dismissal of a complaint based on an affirmative defense, such as a failure to exhaust or based on the statute of limitations, is only appropriate at the pleading stage when the "defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). "[W]hile a court may entertain a motion to dismiss on [affirmative defenses], it may not allocate . . . [burdens] . . . in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Skolas*, 770 F.3d at 251 (internal citation omitted). Rather, the burden of pleading and proving an affirmative defense is borne by the defendant. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997).

## III.    DISCUSSION

Jackson asserts violations of his constitutional rights, as well as violations of state law. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also, Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dept. of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1194 (3d Cir. 1995)).

15

### A.      Official Capacity Claims

Defendants move to dismiss Jackson's claims for damages against them in their official capacities as barred by the Eleventh Amendment.  (ECF No. 24 at 9-12.)  They also argue that the official capacity claims for damages are barred because state employees in their official capacities are not "persons" subject to liability under § 1983.  (*Id.* at 12.)  Jackson responds in opposition, arguing Defendants waived Eleventh Amendment immunity.  (ECF No. 33 at 19-21.)

Official capacity claims are indistinguishable from claims against the governmental entity that employs the Defendants.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978))).  Thus, § 1983 claims against the Defendants in their official capacity are really claims against the Commonwealth, which is shielded from such claims by Eleventh Amendment immunity[7] and, in any event, is not considered a "person" subject to liability under § 1983.  *See Downey v. Pa. Dep't. of Corr.*, 968 F.3d 299, 309-10 (3d Cir. 2020) ("Eleventh Amendment immunity bars actions for retroactive relief against state officers acting in their official capacity."); *see also Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (explaining that, "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity" and is also not considered a person for purposes of § 1983).

---

[7] To avoid the bar of the Eleventh Amendment, "[t]he relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages."  *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102 (1984)).  Because Jackson only seeks money damages for his claims (Compl. at 51), this exception does not apply to his case.

16

Accordingly, the Court will grant Defendants' motion to dismiss Jackson's claims against them in their official capacities.

## B.   Exhaustion

In cases governed by the PLRA, courts must address whether the prisoner-plaintiff has substantially "complet[ed] the administrative review process in accordance with the applicable procedural rules." *Downey,* 968 F.3d at 305 (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), *see also, e.g., Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018); *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir. 2000) ("[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial."). These procedural rules are supplied by the individual prisons. *See, e.g., Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Smith v. Sec'y of Pa. Dep't of Corr.*, 747 F. App'x 101, 103 (3d Cir. 2018) (stating that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of the grievance system at his institution); *Booth v. Churner*, 206 F.3d 289, 299 (3d Cir. 2000) (explaining that a plaintiff must follow each of the steps to exhaust his administrative remedies under the PLRA). "Just as inmates must properly exhaust administrative remedies per the prison's grievance procedures, prison officials must strictly comply with their own policies." *Downey*, 968 F.3d at 305 (citing *Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019) ("[W]e hold that [the PLRA] requires strict compliance by prison officials with their own policies.")).

"There is one exception to the mandatory exhaustion requirement: administrative remedies must be available to the prisoner." *Downey*, 968 F.3d at 305 (citing *Ross v. Blake*, 578 U.S. 632 (2016)). "An administrative remedy is unavailable when it 'operates as a simple dead-end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison

17

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Id*. (quoting *Shifflett*, 934 F.3d at 365); *see also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020). But "[w]hen an administrative process is susceptible [to] multiple reasonable interpretations, . . . the inmate should err on the side of exhaustion." *Ross*, 578 U.S. at 644.

"Exhaustion is . . . a non-jurisdictional prerequisite to an inmate bringing suit and, for that reason, . . . it constitutes a threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time." *Rinaldi*, 904 F.3d at 265 (internal quotations omitted). Accordingly, in cases governed by the PLRA, courts must address whether the prisoner-plaintiff has substantially complied with the prison's specific grievance procedures and determine whether those procedures were "available" to the inmate. *Id*; *Nyhuis*, 204 F.3d at 77-78 ("[C]ompliance with the administrative remedy scheme will be satisfactory if it is substantial."). "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." *Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013) (reversing in part grant of summary judgment to defendants on exhaustion issue; internal citations omitted). However, "where a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment." *Rinaldi*, 904 F.3d at 261 n.1 (internal quotations and alterations omitted); *see also Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004) ("Given that the exhaustion issue turns on the indisputably authentic documents related to Spruill's grievances, we hold that we may also consider these without converting it to a motion for summary judgment.").

18

The DOC's grievance policy, DC-ADM 804,[8] sets forth a three-step process for review of inmate grievances.  An inmate must initially submit a written grievance to the Facility Grievance Coordinator or his designee within fifteen working days after the event upon which the grievance is based.  DC-ADM 804, § 1.A(5), (8).  If the Facility Grievance Coordinator determines that the grievance is properly submitted, a different staff member will be designated to serve as the Grievance Officer for that grievance.  *Id.* § 1.C(3).  The Grievance Officer will review the grievance, issue a decision on the Initial Review Response Form, and provide the decision to the Facility Grievance Coordinator who, in turn, will provide the decision to the inmate.  *Id.* § 1.C(5).  The Initial Review Response shall be provided to the inmate within fifteen working days from the date the grievance was entered into the Automated Inmate Grievance Tracking System; and an extension of ten additional working days may be requested from the Facility Grievance Coordinator/designee if the investigation of the grievance is ongoing.  *Id.* § 1.C(5)(g)-(h).

If the grievance is rejected, the inmate has fifteen working days to appeal in writing to the Facility Manager.  *Id.* § 2.A(1)(a).  The Facility Manager shall notify the inmate of his decision using the Facility Manager's Appeal Response within fifteen working days of receiving the appeal.  *Id.* § 2.A(2)(d)(1).  If the Facility Manager rejects the appeal, the inmate may appeal for Final Review with the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the denial of the Facility Manager's appeal.  *Id.* § 2.B.  Also, an inmate appealing a grievance to Final Review must provide the SOIGA with the following documents: (1) a legible copy of the Initial Grievance; (2) a copy of the initial review response/rejection; (3)

---

[8] As Defendants' Motion recognizes, DC-ADM 804 is publicly available online at: https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf (last visited May 20, 2026).

a legible copy of the Inmate Appeal to the Facility Manager; (4) a copy of the Facility Manager's decision; and (5) a written appeal to the SOIGA. *Id.* § 2.B(1)(j)(1)-(5). If the inmate fails to provide any of the foregoing documentation, his or her Final Appeal may be dismissed. *Id.* § 2.B(1)(j)(6). The SOIGA will respond to the Final Appeal within thirty working days of receipt unless otherwise extended and/or referred. *Id.* § 2.B(2).

### 1. The '232 Grievance (Counts 1, 2, and 3)

Jackson alleges on December 12, 2022, Eason, Robertson, and Rouse were deliberately indifferent to his serious medical need when they ignored him and failed to get him medical help while he was having chest pains. (Compl. at ¶¶ 49-65.) Jackson asserts he filed a grievance but did not attach it to his Complaint. (*Id*. at ¶ 66.) Defendants argue these claims should be dismissed based on a failure to exhaust administrative remedies because he did not appeal the Facility Manager's response to SOIGA and he failed to comply with the submission procedures. (ECF No. 24 at 17-18.) Defendants attached the grievance packet to their Motion. (ECF No. 24-1.) The documents reflect Jackson's '232 Grievance was stamped as "received" by the facility on December 16, 2022, and was subsequently denied on initial review on January 24, 2023, after an investigation into his claims revealed that Eason called the medical unit about his inhaler and told Eason the situation was not an emergency. (*Id*. at 4-5.) The medical unit confirmed Jackson would need to request a sick call to get a new inhaler, and he was seen the next day by a facility medical provider, who renewed his inhaler. (*Id*. at 4.) Jackson received an inhaler on December 16, 2022, and another inhaler the next day. (*Id*.) The grievance officer found prison staff "did their due diligence and did not deny [Jackson] any medical treatment." (*Id*.) Jackson appealed the initial response to the facility manager, which is included in the grievance packet and reflects a "Received" stamp by the facility on February 14, 2023, and states he adopts his "initial

grievance for this incident to support [his] grievance appeal to the facility manager." (*Id.* at 3.) The facility manager, Superintendent Terra, responded on February 23, 2023, dismissing the appeal for a failure to comply with the DC-ADM 804 submission procedures, which requires that "each appeal must contain reason(s) for appealing the initial review response/rejection." (*Id.* at 2.)

In his response, Jackson argues the initial response to the '232 Grievance was due on January 10, 2023, and when he did not timely receive the response, he filed another grievance, #1017135. (ECF No. 33 at 24, 50.) He asserts the grievance officer's response to the '135 Grievance acknowledged the '232 Grievance was overdue, but stated it did not affect his appeal rights. (*Id.* at 24-25.) Jackson argues that because the facility failed to abide by the proper DC-ADM 804 procedures based on the untimely initial response, this "rendered [his] administrative remedies unavailable." (*Id.* at 25.) He also attached the facility's Initial Review Response to the '135 Grievance. (*Id.* at 50.)

Defendants' argument that Jackson failed to properly exhaust the '232 Grievance using DC-ADM 804 procedures must be rejected at this stage of the litigation. Accepting as true Jackson's allegation that the initial response to the '232 Grievance was untimely, and when he did not timely receive the response, he filed another grievance, raises the plausible inference that he attempted to comply with the procedures, but his use of the administrative remedies were thwarted by prison officials making them unavailable to him. *See Shifflett*, 934 F.3d at 365 ("[W]e hold that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement."). The Court notes that the '232 Grievance Packet Defendants attached to their Motion appears to

21

support Jackson's contention that the response was not received within their required fifteen working days policy as it was received by the facility on December 16, 2022, and subsequently denied on initial review on January 24, 2023. (ECF No. 24-1 at 4-5.) Whether Jackson's administrative remedies were exhausted as to the '232 Grievance, and whether the initial review response was untimely, therefore involves a factual inquiry that cannot be determined at this time. . After reviewing the grievance records submitted by the parties in this case, which have not been disputed to be inauthentic or incomplete, the Court concludes Defendants have failed to meet their burden to prove Jackson's failure to exhaust as to the '232 Grievance. *See Jones,* 549 U.S. at 216 (failure to exhaust administrative remedies is an affirmative defense that defendants must plead and prove; it is not a pleading requirement for plaintiffs). Accordingly, the Court will defer to a later stage of the litigation to determine this issue and deny the Motion on this point.

### 2.  The '910 Grievance (Counts 4, 5, 7, and 8)

Jackson alleges on February 3, 2024, Pucci, Hailey, and Gordon were deliberately indifferent when they delayed getting him medical help for at least three hours while he was having chest pains. (Compl. at ¶¶ 67-89.) He further alleges Gordon retaliated against him by sending him to the RHU as punishment for requesting medical help. (*Id.* at ¶¶ 244-251.) Jackson asserts he filed a grievance but he did not attach it to his Complaint. (*Id*. at ¶ 89.) Defendants argue these claims should be dismissed based on a failure to exhaust administrative remedies because he did not appeal the Facility Manager's response to SOIGA. (ECF No. 24 at 18.) Defendants attached the grievance packet to their Motion. (ECF No. 24-2.) The documents reflect Jackson's Grievance #1073910 was stamped as "Received" by the facility on February 7, 2024 (*id*. at 7), and was subsequently denied on initial review on March 13, 2024, after an initial response extension. (*Id*. at 5-6.) The grievance officer denied the '910 Grievance because there

was no evidence Jackson had chest pains or that Pucci delayed getting him medical care nor was there any record of him going to the medical unit that day.  (*Id*. at 5.)  The '910 Grievance was further denied related to the retaliation claims against Gordon because his placement in the RHU was based on suspected drugs found during a search of his cell.  (*Id*.)  Jackson appealed the initial response to the facility manager, which is included in the grievance packet and reflects a "Received" stamp by the facility on March 18, 2024.  (*Id*. at 3.)  Superintendent Terra responded on April 10, 2024, denying his appeal and upholding the decision of the grievance officer.  (*Id.* at 2.)

In his response, Jackson asserts that because the facility manager's response denying his appeal exceeded fifteen working days, Defendants failed to abide by the proper DC-ADM 804 procedures and "rendered [his] administrative remedies unavailable."  (ECF No. 33 at 25-26.)  He attached a copy of the initial response appeal and the facility manager's response related to the '910 Grievance.  (*Id*. at 51-52.)

Defendants' argument that Jackson failed to properly exhaust the '910 Grievance using DC-ADM 804 procedures must be rejected.  Accepting as true Jackson's allegation that Superintendent Terra's appeal response to the '910 Grievance was untimely, raises the plausible inference that he attempted to comply with the procedures, but his use of the administrative remedies were thwarted by prison officials making them unavailable to him.  *See Shifflett*, 934 F.3d at 365.  The Court notes that the '910 Grievance Packet Defendants attached to their Motion appears to support that the appeal response was not received within their policy's fifteen working days period as Jackson's appeal reflects a "Received" stamp by the facility on March 18, 2024, and Superintendent Terra's appeal response reflects the date of April 10, 2024.  (ECF No. 24-2 at 2-3; *see also* ECF No. 33 at 51-52.)  Whether Superintendent Terra's appeal response was

untimely as to the '910 Grievance, and whether Jackson's administrative remedies were discharged as a result, therefore involves a factual inquiry that cannot be determined at this time. Accordingly, the Court will deny the Motion on this point and defer to a later stage of the litigation to determine this issue.

### 3. The '010 Grievance and the '987 Grievance (Counts 16, 17, 18, and 19)

Jackson generally alleges that the "hazardous" and "toxic" air quality in the RHU caused him to constantly cough and choke "from the polluted environment," which heightened "the risk of Jackson having an asthma attack from shortness of breath, or possibly even dying." (Comp. at ¶¶ 153-154.) He claims Superintendent Terra, Stephens, Fedder, and "both RHU lieutenants," presumably Kertes and Muick (*see id.* at ¶ 317), knew the air quality was hazardous to his health because he "submitted request slips" and filed several grievances "in reference to these atrocious acts." (*Id.* at ¶¶ 153, 158.) To his Complaint, he attached an Initial Review Response from the facility dated March 21, 2024, denying his grievance related to the air quality, identified as Grievance #1075493, indicating that "it should be noted that the ongoing issue of air quality in the RHU is a result of other inmates." (*Id.* at 60.)

Defendants concede Jackson properly completed the appeal process through SOIGA related to the '493 Grievance, but argue these claims are not properly exhausted because he failed to identify the Defendants in his initial grievance and appeals. (ECF No. 24 at 19.) Defendants attached the '493 Grievance Packet to their Motion. (ECF No. 24-4.) Jackson's '493 Grievance alleges on February 17, 2024, he hit his call button over 100 times due to a shortness of breath and was trying to inform the officer in the bubble he needed his inhalers. (*Id.* at 3.) He claims he was ignored by the bubble officer, who was aware of his medical conditions. (*Id.*) He further claims the air in the RHU is hazardous to his health and notes he talked to

24

Bangert the day prior about his call button. (*Id*.)  After the '493 Grievance was denied in the initial response, he appealed to the facility manager, which again refers to "the bubble officer" as the individual who subjected him to deliberate indifference and cruel and unusual punishment. (*Id*. at 6.)  Superintendent Terra denied his appeal and upheld the decision of the grievance officer. (*Id*. at 7.)  He appealed Superintendent Terra's decision to SOIGA, again referring to the individual who ignored him as "the bubble officer" and "Officer John Doe." (*Id*. at 8.)  He refers to the individual who knew about the RHU air quality as "CO John Doe." (*Id*.)

Jackson does not dispute the authenticity of the '493 Grievance Packet attached to Defendants' Motion, but argues Defendants did not identify the correct grievances for these claims. (ECF No. 33 at 26.)  He asserts the proper grievance related to Counts 16 and 17 is Grievance #1077010, and the proper grievance related to Counts 18 and 19 is Grievance #1076987. (*Id*.)  He attached the '010 Grievance, which mentions the incident on February 17, 2024, described above. (*Id*. at 55-56.)  In it, he also generally complains about the RHU air quality, that he feels like he is suffocating on a daily basis, and alleges "SCI Phoenix, PRC, the Superintendent, the RHU LTs, and the Unit Manager are aware that the air quality is hazardous to[his] health." (*Id*.)  He further complains he is "constantly requesting his inhaler, but the bubble never answers the call button." (*Id*.)

He also attached the '987 Grievance, which mentions the incident on February 18, 2024, and identifies that when he told "Nurse Rosemary" he could not breathe, she replied there was nothing she could do. (*Id*. at 57.)  He further alleges shortly after, he told an "officer CO John Doe" that it was hard for him to breathe and CO Doe said he would try to get Jackson help. (*Id*.)

Defendants did not file a reply to Jackson's arguments, and their initial motion does not address the administrative remedies related to either the '987 Grievance or the '493 Grievance.

25

As a failure to exhaust administrative remedies is an affirmative defense that defendants must plead and prove, it is not possible, or proper, for the Court to address if the '987 Grievance and/or the '493 Grievance were properly exhausted at this stage of the proceedings. *See Jones,* 549 U.S. at 216. Accordingly, the Motion is denied on this point.

### C.    Access to Courts Claim (Count 15)

Jackson's access to courts claim alleged in Count 15 encompasses two separate incidents that must be distinguished. The first incident relates to Hopson and Aguilar confiscating four boxes of his legal materials related to a pending lawsuit on September 20, 2022. (Compl. at ¶¶ 129, 133-136.) Jackson filed Grievance #999231 related to this confiscation, which was denied. (Compl. at ¶¶ 135-136; *see also id*. at 56.) The second incident relates to Hopson and Hensley not allowing him to access his legal materials after Terra approved his legal exemption request on November 8, 2022. (*Id*. at ¶¶ 146-148.) Defendants argue Count 15 should be dismissed because it is not only barred by the statute of limitations, but also fails to state a claim. (ECF No. 24 at 20-21, 25-26.)

### 1.    Statute of Limitations

The timeliness of Jackson's § 1983 claims are governed by Pennsylvania's two-year statute of limitations. *See, e.g.,* 42 Pa. Cons. Stat. § 5524; *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). A claim accrues "when a plaintiff has a complete and present cause of action, that is, when [he] can file suit and obtain relief." *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (quotations omitted). In general, this means that the statute of limitations will start running at the time the plaintiff "knew or should have known of the injury upon which [his] action is based." *Sameric Corp. of Del. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998). Defendants argue the '231 Grievance was fully

exhausted when Jackson received the final appeal decision from SOIGA on January 20, 2023. (ECF No. 24 at 21.)  Defendants attached the '231 Grievance Packet to their motion.  (ECF No. 24-3.)  The '231 Grievance reflects the first incident encompassed in Count 15 that occurred on September 20, 2022, when Aguilar and Hopkins confiscated four of his legal boxes.  (*Id*.; *see also* Compl. at 56.)  However, Jackson responds that Count 15 is related to Grievance #1008737, not the '231 Grievance, which "is within the statute of limitations and any claims included in Count 15 are not barred and should prevail." (ECF No. 33 at 27.)  Jackson attached the '737 Grievance to his Response, which reflects the second incident encompassed in Count 15, alleging Hopson and Hensley did not allow him to access his legal materials after his exemption request was approved.  (ECF No. 33 at 53.)  Jackson requested monetary damages in the '737 Grievance.  (*Id*. at 54.)  Defendants did not file a reply to Jackson's response disputing the '737 Grievance.  Therefore, Defendants' Motion to dismiss the claims against Hopson and Hensley based on the statute of limitations and/or exhaustion for not allowing Jackson to have the confiscated legal materials after Terra approved the legal exemption will be denied.

Although Jackson contends his access to courts claims only relates to '737 Grievance, in addition to Hopson and Hensley, he also names Aguilar and Mascellino as defendants in Count 15.  The only personal involvement alleged against Aguliar and Mascellino in the Complaint relates to the '231 Grievance, which was fully exhausted on January 20, 2023, and those claims are time barred.  Jackson's Complaint was filed on March 5, 2025.  Although the Complaint is dated January 13, 2025 (Compl. at 51-52), the Certificate of Service is dated February 18, 2025 (*id*. at 53), meaning Jackson still had it in his possession as of that later date.  A prisoner's complaint is considered filed at the time he hands it over to prison authorities for forwarding it to the Court.  *See Moody v. Conroy*, 680 F. App'x 140, 144 (3d Cir. 2017) (*per curiam*) ("Under the

27

prison mailbox rule, . . . a pleading is deemed filed at the time a prisoner executes it and delivers it to prison authorities for mailing."). The rule applies whether the document is ultimately mailed or uploaded electronically. *Webb v. Dep't of Justice*, 117 F.4th 560, 567 (3d Cir. 2024). Therefore, even under the most liberal calculation, the proper date for determining the applicability of the statute of limitations is February 18, 2025 and any claims arising prior to February 18, 2023, are time barred.[9] Because the '231 Grievance was exhausted prior to February 18, 2023, the access to courts claims against Aguliar and Mascellino are untimely, and they will be terminated from this action.

### 2. Failure to State a Claim

Hopkins and Henley also move to dismiss Jackson's access to courts claim for failure to state a claim. (ECF No. 24 at 25-26.) "Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury' -- that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). "The complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" *Id*. at 205-06 (footnote omitted and quoting *Christopher*,

---

[9] Defendants also claim that the '231 Grievance was not exhausted because Jackson did not request money damages and attached it to their Motion. (ECF No. 24-3 at 3.) Further, it appears Jackson bring his claims against Mascellino solely based on his involvement in the grievance process. Because Jackson argues that the '231 Grievance is not the relevant grievance here, and the events are nonetheless time barred, the Court does not need to entertain these additional reasons for dismissal.

536 U.S. at 416-17). In other words, a prisoner claiming that he was denied access to the courts must allege an injury traceable to the conditions of which he complains. *See Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (*per curiam*) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library to harm in underlying action).

In his Complaint Jackson alleges that, after Superintendent Terra partially approved his legal exemption request to keep one box of legal materials, Hopson and Hensley failed to respond to his request to release his legal materials and insinuates the materials were destroyed. (Compl. at ¶¶ 134-139, 146-150.) As a result, he claims he was unable to conduct discovery in his pending lawsuit, making him "miss his deadline to pursue a meritorious issue," and his conspiracy claims were ultimately unsuccessful based on being denied access to the courts. (*Id.* at ¶ 307.) He claims that if the two Defendants had not acted, he "could have conducted interrogatories, admission, and depositions to support his conspiracy claims." (*Id.* at ¶ 309; *see also id.* at ¶ 312 (same).) Defendants seek dismissal of this claim because he has not alleged an actual injury. (ECF No. 24 at 25-26.) Jackson responds in opposition arguing that he was not able to thoroughly conduct discovery to advance his conspiracy claims, which "could have had a chance to prevail" absent Defendants denying him access to the Courts. (ECF No. 33 at 38-40.)

The court records from the underlying case indicate that, although he requested two extensions of time to respond to the defendants' summary judgment motion based on having limited access to the law library in the RHU, the Court granted his requests for extensions of time to respond. *See Demaske*, No. 20-1226 (W.D Pa. (ECF Nos. 94, 95, 102, 103).) Although Jackson asserts he missed a deadline, the record reflects that he subsequently filed his timely response in opposition to the summary judgment motion, including the conspiracy claims, totaling two-hundred and twenty five pages with exhibits. *Id.* (ECF No. 105).

29

The Magistrate Judge's Report and Recommendation concluded that the motion for summary judgment should be granted in part and denied in part, which the District Court accepted and adopted in its entirety.  *Id.* (ECF Nos. 107, 109).  Relevant here, the Court granted the summary judgment motion for the defendants related to the conspiracy claims, finding:

> Plaintiff makes only conclusory allegations that various defendants engaged in various conspiracies.  These bald statements lack any evidentiary support.  Moreover, the fact that various individuals may have acted with deliberate indifference to Plaintiff's serious medical needs does not lead to the conclusion that they conspired to do so, and there are no facts in the record to support any conspiracy claims against any of the Defendants.

*Id*. (ECF No. 107 at 26-27).  Jackson also attached this excerpt to his Complaint.  (*See* Compl. at 57-58.)

Jackson fails to assert the actual loss element plausibly since the record in the underlying case is clear that he did not miss a deadline due to the Defendants' actions, and he had a full opportunity to argue the merits of the underlying claim.  The court record reflects that he was twice given additional time to file his response, which he timely filed a very thorough response, and ultimately succeeded on some of his arguments that summary judgment should be denied. Notably, in his two requests for extensions of time to respond to the pending summary judgment motion, both of which were filed after he learned the box was missing, Jackson did not mention any inability to access his legal materials.  (*See id.* (ECF Nos. 94, 102).)  Rather, he cited only to his then current placement in the RHU as limiting his time to go to the law library.  (*Id*.)  Later, when he filed his Response, Jackson again did not mention any inability to access discovery materials and made substantive arguments to meet his summary judgment burden on his conspiracy claims, which the Court ultimately rejected because he failed to meet his burden of production.  (*See id.* (ECF No. 105 at 24-29).)  He does not describe any underlying nonfrivolous claims he was unable to pursue as a result of missing a deadline and he merely speculates that his

legal materials would have altered the underlying result.  He does not describe the contents of

these legal materials or indicate how they were even material to the lost conspiracy claim.

Jackson's access to courts allegations do not have any causal connection to an actual injury, but

instead are purely speculative and based on a mere hope he "could have" prevailed if he "could

have" accessed his materials.  Accordingly, this claim is not plausible, and the Court will grant

Defendants' motion to dismiss Count 15.  *See, e.g.*, *Talley v. Varner*, 786 F. App'x 326, 328 (3d

Cir. 2019) (*per curiam*) (affirming dismissal of access-to-the-courts claim where inmate, *inter

alia*, failed to allege what underlying nonfrivolous claims he was unable to pursue); *Monroe*, 536

F.3d at 206 (finding that plaintiffs' allegations that "they lost the opportunity to pursue attacks of

their convictions and civil rights claims" without "specify[ing] facts demonstrating that the

claims were nonfrivolous" did not state a claim); *Christopher*, 536 U.S. at 417 (explaining the

complaint must describe the underlying arguable nonfrivolous claim well enough to show that it

is "more than hope").

### D.    Retaliation Claims (Counts 8, 10, 14, 20, and 21)

In order to state a plausible First Amendment retaliation claim, a prisoner must allege

that:  (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action

sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3)

the constitutionally protected conduct was "a substantial or motivating factor" for the adverse

action.  *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (citing *Rauser v. Horn*, 241 F.3d 330,

333 (3d Cir. 2001)); *see also Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020) (*per curiam*).

A prisoner's filing of a grievance or lawsuit constitutes constitutionally protected conduct.

*Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016); *see also Robinson v. Taylor*, 204 F. App'x

155, 157 (3d Cir. 2006) (*per curiam*) (holding that a prisoner's filing of a grievance is

31

constitutionally protected conduct).  "An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de minimis*.'"  *Watson*, 834 F.3d 417, 423 (3d Cir. 2016) (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (alterations in original)).[10] The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct may establish a causal link between the two for purposes of establishing motivation.  *See Watson*, 834 F.3d at 422.  For example, allegations of (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link may be sufficient to allege a causal link.  *Id.* at 424.   However, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Id*. (citation footnote omitted).  Moreover, causation, like any other fact, can be pled plausibly from the "record as a whole."  (*Id*.)  Defendants seek dismissal of Jackson's retaliation claims, contending, *inter alia*, that he has failed to allege adverse action and/or failed to establish a causal link between the protected activity – the filing of grievances – and the alleged adverse actions.  (ECF No. 24 at 21-25.)

Jackson alleges several instances of First Amendment retaliation, and there is no question that he has filed several grievances that constitute protected conduct.  *Watson*, 834 F.3d at 422.

---

[10] "[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436 F.3d at 170); *see also, e.g., Mitchell*, 318 F.3d at 530-31 ("Mitchell's allegation that he was falsely charged with misconduct in retaliation for filing complaints against Officer Wilson implicates conduct protected by the First Amendment."); *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (*per curiam*) ("In the prison context, we have held that the following actions were sufficient to establish adversity: several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs.").

Relevant to his retaliation claims, Jackson filed grievances against Gordon, Hopson, Rodriguez, Taylor, Bangert, Stephens, Fedder, Sergeant Terra, and Kalb, and he also brought a prior lawsuit against the DOC and its staff that Defendants were aware of.  (*See, e.g.,* Compl. at ¶¶ 89, 115, 120, 128, 145, 150, 172, 177.)  Further, Jackson has sufficiently alleged numerous instances of more than *de minimis* adverse action, including, *inter alia*, placement in the RHU (*see id.* at ¶¶ 87-89); the confiscation of his legal materials (*id.* at ¶¶ 118-127, 146-149); denial of access to the law library (*id.* at ¶¶ 173-177); refusing to move him from another inmate who clogged their adjacent cell vents with feces on a daily basis and previously assaulted him (*id*. at ¶ 90-108); and verbal harassment and refusing his yard request.  (*Id.* at ¶¶ 170-171).

He also has alleged that each of the adverse actions is causally connected to the filing of grievances, including allegations of being threatened or told that his grievance activity or lawsuits resulted in the adverse action.  For instance, Jackson alleges Bangert and Stephens threatened he would be assaulted with feces by other inmates if he filed a grievance (*id*. at ¶¶ 101-102), and Sergeant Terra made a similar threat because "he likes to file grievances" (*id*. at ¶ 105); Taylor said to him, "When you file lawsuits, we can do what we want!" and since he "likes to file lawsuits, this is how things work" and if he opens his mouth, "things will get worse" when his legal property was confiscated (*id*. at ¶¶ 120, 123); and Bangert told him when not allowing him law library access, "You're not getting any extra time in the law library until you withdraw that PREA (¶ 172) and all those grievances you filed.  Matter fact, I'm not letting you in the law library today, tomorrow, or Thursday for that matter, and Fedder gave me his blessing, so you can forget about that law library and any extra time."  (*Id.* at ¶ 175.)  At the preliminary juncture in this litigation, the allegations in the Complaint are sufficient to suggest a pattern of antagonism between Jackson's protected activity and the resulting adverse actions.

Consequently, Jackson has alleged sufficient facts to survive the motion to dismiss his First Amendment retaliation claims, and Defendants' motion will be denied as to these claims. *See, e.g., Rosario v. Cook,* No. 22-0866, 2024 WL 1077320, at *3 (M.D. Pa. Mar. 12, 2024) (denying motion to dismiss First Amendment retaliation claim where plaintiff's complaint established that he engaged in constitutionally protected conduct when he filed a grievance against prison officials and was told that his property was taken to stop plaintiff from filing lawsuits); *Nichols v. Phillips*, No. 17-2604, 2018 WL 286740, at *6 (E.D. Pa. Jan. 3, 2018) (concluding that verbal harassment or threats, with some "reinforcing act accompanying them" may establish an adverse action); *Medina v. City of Philadelphia*, No. 2004 WL 1126007, at * 7 (E.D. Pa. May 19, 2004) ("Certainly, confiscation [of personal property] could deter a prisoner from exercising his constitutional right to petition the court to redress future grievances.").

### E.      Failure to Protect Claims (Counts 2, 13, 17, and 19)

Defendants move to dismiss "a majority of Jackson's failure to protect claims," specifically Counts 2, 13, 17, and 19, as duplicative of his Eighth Amendment deliberate medical indifference claims alleged in Counts 1, 12, 16, and 18 based on the same allegations. (ECF No. 24 at 28-29.)  Defendants concede his failure to protect claims alleged in Count 9 related to being assaulted by inmate Torres is "the exception" to this request and do not make any arguments to dismiss this claim. (*Id*. at 28.)

The Eighth Amendment, made applicable to the individual states through the Fourteenth Amendment, prohibits states from inflicting "cruel and unusual punishments" on those convicted of crimes. *See Rhodes v. Chapman*, 452 U.S. 337, 344-46 (1981).  Under the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, including adequate food, clothing, shelter, medical care, and must take reasonable measures to

34

guarantee the safety of the inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (internal quotation and citation omitted).  Courts have found that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners."  *Id.* at 833 (internal quotations omitted).  "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.'"  *Id.* at 834 (quoting *Rhodes*, 452 U.S. at 347).  For a failure to protect claim against a prison official to be plausible, a plaintiff must allege that: (1) the conditions in which he was incarcerated posed a substantial risk of serious harm; (2) the prison official acted with deliberate indifference to that substantial risk of serious harm; and (3) the official's deliberate indifference caused harm.  *See Farmer*, 511 U.S. at 834; *see also Travillion v. Wetzel*, 765 F. App'x 785, 790 (3d Cir. 2019) (*per curiam*).  A prison official demonstrates deliberate indifference to the risk of inmate-on-inmate violence if, before an attack, the official knows an inmate faces "an excessive risk of harm" from another prisoner but does nothing to prevent the assault.  *Bistrian v. Levi*, 696 F.3d 352, 369 (3d Cir. 2012), *abrogated on other grounds as recognized in Hightower v. City of Philadelphia,* 130 F.4th 352, 357 (3d Cir. 2025).  Deliberate indifference may also exist if, when an attack occurs, an official has "a realistic and reasonable opportunity to intervene" but "simply refuse[s] to do so."  *Id.* at 371 (quoting *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002)).

In contrast, to state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer*, 511 U.S. at 835.  A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at

35

837. Deliberate indifference is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (citation omitted). "[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017)).

Defendants' argument that the failure to protect claims in Counts 2, 13, 17, and 19 are best analyzed under the Eighth Amendment deliberate medical indifference standard is well taken. For instance, the allegations in Count 1 are brought against Eason, Rob, and Rouse for deliberate medical indifference after he claims they ignored his request for medical treatment for nearly three hours. (Compl. at ¶¶ 54-65, 178-186.) He also brought a failure to protect claim against Eason, Rob, and Rouse in Count 2 based on these same allegations. (*Id.* at ¶¶ 187-195.) His failure to protect claims in Counts 17 and 19 stem from allegations that his requests for medical treatment were ignored when he had chest pains and trouble breathing in the RHU, which are also the same underlying allegations for his medical indifference claims in Counts 16 and 18. (*Id.* at ¶¶ 151-169, 316-351.) His allegations in Count 13 similarly bring a failure to protect claim against Kalb and Stephens based on a deliberate medical indifference related to his asthma for the same assertions in Count 12. (*Id.* at ¶¶ 109-115, 279-296.) The claims in Counts 2, 13, 17, and 19 do not allege that any Defendant knew that he faced "an excessive risk of harm" from another prisoner and did nothing to prevent an assault, or that any Defendant had "a

36

realistic and reasonable opportunity to intervene" during an inmate attack and failed to do so. *Bistrian*, 696 F.3d at 371. Instead, Plaintiff's factual allegations asserted in Counts 2, 13, 17, and 19 assert a failure to receive medical treatment and are best construed under the Eighth Amendment deliberate medical indifference, and are thus duplicative of Counts 1, 12, 16, and 18. Therefore, the Court will grant Defendants' motion to dismiss Counts 2, 13, 17, and 19. *See Graham v. Pa. Dep't of Corr.*, No. 21-146, 2022 WL 2276580, at \*5 (W.D. Pa. Apr. 5, 2022) (dismissing failure to protect claim as being duplicative of Eighth Amendment deliberate indifference to serious medical needs claim).

### F.    Claims Against Superintendent Terra, Kertes, and Muick

The only claims Jackson brings against Superintendent Terra,[11] Kertes, and Muick are related to his claims about the poor air quality in the RHU. (Compl. at ¶¶ 316-324.) He alleges Superintendent Terra, Kertes, and Muick knew the air quality was hazardous to his health because he "submitted request slips" and filed several grievances "in reference to these atrocious acts." (*Id*. at ¶¶ 153, 158.)

As an initial matter, a prison official's participation in the grievance process, failure to take action in response to a prisoner's written correspondence about the conditions in which he is confined, or failure to act after becoming aware of an employee's actions, is, without more, an insufficient basis upon which to base those officials' personal involvement in the underlying

---

[11] The Court recognizes Defendants only move to dismiss Kertes and Muick. However, since Jackson is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). Superintendent Terra also should be dismissed for the same reasons as Kertes and Muick as explained in this section.

violations.  *See, e.g., Murray v. McCoy*, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) ("Superintendent Ransom's awareness of Murray's allegations concerning C.O. McCoy, without more, is insufficient to establish personal involvement" (citing cases));  *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*) ("Contrary to Robinson's assertions, awareness of a grievance or complaint after the allegedly unconstitutional conduct has occurred, without more, is insufficient to establish personal involvement.").  Furthermore, generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are also insufficient to allege personal involvement in an underlying constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).  Also, liability under § 1983 cannot be predicated on a *respondeat superior* basis.  *See, e.g., Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).

Rather, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir.

38

2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227.

The first type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must "identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure." *Barkes*, 766 F.3d at 317; *see also Chavarriaga*, 806 F.3d at 227. A supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official. *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that failure to train and supervise claims asserted against supervisor defendants were meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation). "Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Id.*

Jackson alleges Superintendent Terra, Kertes, and Muick knew about the harmful air quality based solely on his request slips and grievances. (Compl. at ¶¶ 153, 158, 317-324.) Mere awareness is not enough to plausibly allege a claim for supervisory liability or personal involvement. He does not allege any specific act personally taken by these supervisors or

connect any acts taken by them to his injury based on the RHU's air quality.  Further, he does not allege any policy, practice, or custom they established that caused the alleged harm.  Accordingly, the claims against Superintendent Terra, Kertes, and Muick will be dismissed, and these defendants will be terminated from this action.

### G.      State Law Claims (Counts 3, 5, and 11)

Lastly, Defendants argue Jackson's state law tort claims for intentional infliction of mental distress[12] are barred by sovereign immunity.  (ECF No. 24 at 30-31.)  Jackson responds in opposition, arguing these claims should not be dismissed because they breached a duty of care to "his physical health and overall safety."  (ECF No. 33 at 45.)  By statute, Pennsylvania law provides agencies, officials, and employees of the Commonwealth acting in the scope of their duties with sovereign immunity from damages claims subject to exceptions[13] not applicable here. *See* 1 Pa. Cons. Stat. § 2310 (establishing immunity for Commonwealth officials and employees); 42 Pa. Cons. Stat. § 8521 (limiting waiver of immunity to specific exceptions); *id.* § 8522 (setting forth limited exceptions); *see also Stackhouse v. Pa. State Police*, 892 A.2d 54, 58 (Pa. Commw. Ct. 2006) ("Generally, the Commonwealth and its agencies, officials and employees acting within the scope of their duties are immune from suits for damages.").  The exceptions to immunity are to be "strictly and narrowly construed."  *Hanna v. Lehigh Cnty. Dep't of Corr.*, No. 22-4305, 2024 WL 1259269, at *8 (E.D. Pa. Mar. 25, 2024) (citing *Sugalski*

---

[12] Jackson appears to be asserting the state law tort claim of intentional infliction of emotional distress.  *See Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 248 (3d Cir. 1999) ("We apply the applicable law, irrespective of whether a *pro se* litigant has mentioned it by name.").

[13] The exceptions to immunity are: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, (8) care, custody or control of animals, and (9) sexual abuse.  *See* 42 Pa. Const. Stat. § 8542(b).

*v. Commonwealth*, 569 A.2d 1017, 1019 (Pa. Commw. Ct. 1990)).  Further, "[u]nlike a municipal officer who is not immune from suit . . . for harm caused by willful misconduct, 42 Pa. Cons. Stat. § 8550, a state officer is shielded from liability for intentional torts committed while acting within the scope of his duties."  *Bracey v. Betancourt*, No. 20-6205, 2021 WL 5112246, at *7 (E.D. Pa. Nov. 3, 2021); *see also, e.g., Poteat v. Lydon*, No. 22-2114, 2023 WL 6620368, at *3 (3d Cir. Oct. 11, 2023) (*per curiam*) ("State sovereign immunity bars these suits against the Commonwealth and its employees acting within the scope of their duties, as the PSP employees were, and the limited negligence exceptions to sovereign immunity do not apply as Poteat alleged only intentional torts."); *Kidd v. Pennsylvania*, 37 F. App'x 588, 592 n.3 (3d Cir. 2002) (summarily dismissing intentional infliction of emotional distress claim because "[t]he Commonwealth, it subdivisions, and its employees acting within the scope of employment enjoy Eleventh Amendment immunity in federal court.  The Pennsylvania legislature has not chosen to waive this immunity for intentional torts." (citation omitted)).  As none of the exceptions are applicable to the facts alleged, Jackson's state law tort claims are barred by immunity, and the Court will grant Defendants' motion to dismiss as to these claims.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be granted in part and denied in part.  The Motion will be granted as to the following claims, which will be dismissed with prejudice:

    a.   All Official Capacity Claims against Defendants

    b.   All Claims against Superintendent Terra, Kertes, and Muick

    c.   Any Claims based on Grievances

    d.   Counts 2, 13, 17, and 19: Failure to Protect Claims

    e.   Counts 3, 5, and 11: State Law Tort Claims

    f.   Count 15: Access to Courts Claims

Defendants' Motion will be denied as to the following claims:

    a.   Count 1: Eighth Amendment Medical Indifference Claims against Eason, Robertson, and Rouse

    b.   Count 4: Eighth Amendment Medical Indifference Claims against Pucci and Haley

    c.   Count 7: Eighth Amendment Medical Indifference Claims against Gordon

    d.   Count 8: First Amendment Retaliation Claims against Gordon

    e.   Count 10: First Amendment Retaliation Claims against Rodriguez, Taylor, Bangert, Stephens, Fedder, and Sergeant Terra

    f.   Count 14: First Amendment Retaliation Claims against Hopson, Taylor, Stephens, Fedder, and Bangert

    g.   Count 16: Eighth Amendment Medical Indifference Claims against Stephens and Fedder

    h.   Count 18: Eighth Amendment Medical Indifference Claims against Joseph

    i.   Count 20: First Amendment Retaliation Claims against Kalb

    j.   Count 21: First Amendment Retaliation Claims against Bangert

Defendants did not move to dismiss Counts 6,[14] 9, and 12, and those claims also remain pending.  No claims remain against Aguliar, Mascellino, Hensley, Superintendent Terra, Kertes,

---

[14] The Court recognizes Jane Doe Nurses 1 and 2 are the only defendants named in Count 6 and have not yet been identified or served.  Jackson is reminded of his obligation to identify all Doe Defendants during discovery, so they can be served.  If he can successfully identify these Defendants, he shall file a motion to substitute their names.

43

and Muick and they will be terminated from this case.  The Court will direct the remaining

Defendants to file a responsive pleading as to the pending claims against them.

**BY THE COURT:**

**/s/ Michael M. Baylson**

_____

**MICHAEL M. BAYLSON, J.**
